# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
January 29, 2013 Session

## STATE OF TENNESSEE v. DOUGLASS LEON LYLE

**Appeal from the Criminal Court of Knox County**
**No. 94696    Jon Kerry Blackwood, Judge**

---

**No. E2012-00468-CCA-R3-CD - Filed March 28, 2013**

---

Douglass Leon Lyle ("the Defendant") was convicted by a jury of two counts of aggravated sexual battery. After a hearing, the trial court sentenced the Defendant to twelve years for each offense, to be served concurrently in the Tennessee Department of Correction. In this appeal as of right, the Defendant raises the following issues: (1) the State's election of offenses was ineffective; (2) the trial court should have merged the two convictions; (3) the trial court erred in its ruling on a Tennessee Rule of Evidence 412 motion; (4) the jury charge was erroneous; and (5) his sentences are excessive. We hold that the State's election of offenses was ineffective as to Count 2, and we reverse that conviction and remand for further proceedings. We affirm the trial court's judgment of conviction and sentence as to Count 1.

**Tenn. R. App. P. 3 Appeal as of Right;**
**Judgments of the Criminal Court Affirmed in Part,**
**Reversed in Part; Remanded**

JEFFREY S. BIVINS, J., delivered the opinion of the Court, in which ALAN E. GLENN and ROGER A. PAGE, JJ., joined.

Mark Stephens, District Public Defender, and Robert C. Edwards, Assistant Public Defender, Knoxville, Tennessee, for the appellant, Douglass Leon Lyle.

Robert E. Cooper, Jr., Attorney General & Reporter; Leslie E. Price, Senior Counsel; Randall E. Nichols, District Attorney General; Steven W. Sword, Assistant District Attorney; and Josh Arters, Special Prosecuting Attorney, for the appellee, State of Tennessee.

# OPINION

## Factual and Procedural Background

By presentment filed May 18, 2010, the Defendant was charged with one count of rape of a child and two counts of aggravated sexual battery, all involving his minor granddaughter T. L.[1]  The offenses were alleged to have been committed between July 1, 2006, and July 31, 2009.  At the Defendant's ensuing jury trial, the following proof was adduced:

The victim, T. L., testified that she was eleven years old at the time of trial in July 2011.  Her birth date was June 4, 2000, and she had just finished the fifth grade.  She lived with her mother, her stepfather, and her brother, who was twelve years old.  She also had three sisters who lived with her father.

As T. L. was growing up, she visited her father's parents, the Defendant and his wife, Delilah ("Grandmother").  Sometimes she would spend the night with them.  She testified that she loved her grandfather, the Defendant, whom she called "papaw."  She also stated that he had made her uncomfortable by touching her "wrongly."  When asked where he touched her, she testified, "[m]y private."

The prosecutor then showed T. L. a drawing of a girl.  As the prosecutor pointed to different areas of the drawing's body, T. L. identified them with her own words, including "chest," "butt," and "private."  She stated that she knew what the word "vagina" meant, explaining that it referred to "[a] girl's part."  She agreed that she meant the same by the word "private."

The prosecutor next showed T. L. a drawing of a man.  When asked what she called "the front private part where a man goes pee out of," she responded, "[p]rivate."  She confirmed that she had heard the word "penis" and stated that it was a "boy's front part."  She agreed that her word "private" and the word "penis" referred to the same thing.

When asked where the Defendant had touched her, T. L. stated, "[m]y chest, my private, and my butt."  She added that it had happened more than once but not every time she visited.  It started when she was in kindergarten and ended when she was ten years old.  She added that the last time it happened, she was between the fourth and fifth grade.

---

[1] This Court's policy is to identify victims of sex crimes only by their initials.

T. L. testified that the touchings occurred in her grandparents' living room. She remembered it happening in the Defendant's brown leather recliner chair. It also happened on a couch in the living room and in the Defendant's bedroom. She explained that, on one particular occasion, she was sitting next to the Defendant in his recliner while they watched television. He touched her "private" with his hand, and the touching was both over and under her underwear. While his hand was under her underwear, he rubbed, which felt "bad." He also put his finger inside of her, which felt "scratchy." She also described the sensation as "feel[ing] kind of weird." She stated that he put his finger inside of her more than once. She also stated that he would touch her "private part" without putting his finger inside.

T. L. testified that the Defendant also rubbed her "private part" through her clothing, without putting his hand inside her clothing, while they were sitting on the chair.

When asked what happened on the couch, T. L. testified that the Defendant touched her chest with his hand. She stated that this did not occur "that much." This touching occurred over her clothing. He also touched her chest while she was sitting on his bed in his bedroom. She was not sure if he ever touched her "private" in the bedroom. He did not touch her "private" on the couch.

When asked if the Defendant said anything while touching her, T. L. testified that he told her, "Don't tell or we'll both get in trouble." Nevertheless, she told her mother in October 2009 about the touching. She explained that she had not told anyone before because she was "scared and embarrassed." She added that she was scared that no one would believe her. When her mother first came to her and inquired, she told her mother "no" because she was "too scared." She also testified that no one else had touched her like that.

On cross-examination, T. L. stated that the touchings usually occurred in the mornings while Grandmother was still asleep. She also stated that she had discussed the matter with her mother four times.

The victim's mother ("Mother"), testified that she and the victim's father ("Father") had divorced about four years previously. She currently was married to George Michael Ailey, and the victim and her brother lived with her and Ailey. While she and Father were married, they lived with Father's parents, the Defendant and Grandmother. Mother stated that her in-laws "were just like a mom and dad to" her. After she and Father divorced, "things seemed okay at first." After she married Ailey, however, "it seemed like things kind of went downhill from there." She added that she did not feel as if they "cared for [Ailey] a whole lot." However, they attended her wedding to Ailey. After the divorce, her children continued to spend time with the Defendant and Grandmother.

3

Mother testified that the victim began wetting her pants in school when she was in second or third grade. After T. L. told her what had happened, her accidents at school declined and then stopped.

Mother testified that she had a "very vivid dream" one night in which she "found a pair of panties." Ailey and Ailey's father were in the dream. She awoke from the dream "frantic" and became concerned about her children. The next day, she sat both her son and the victim down and asked them if anyone had ever touched them inappropriately. T. L. shook her head, but Mother noticed that her eyes were filled with tears. Mother called the victim's school to speak with a guidance counselor for advice. She was given the number for ChildHelp, and she called them. The next day, she took the victim in to speak with a counselor.

Later, Grandmother and "Aunt Mo"[2] visited and spoke with the victim outside of Mother's presence but with her permission.

On cross-examination, Mother testified that she and Father married in February 1997. They had two children, the victim and her older brother, Nicholas. They divorced in May 2007. After she and Father split up, she and the children moved in with the Defendant and Grandmother ("the Lyles") and lived with them for about one year. The Lyles helped with child care and took care of the children when needed. There were often other children there, as well. Mother dated while she lived with the Lyles, sometimes staying out all night. When she began staying out all night frequently, Grandmother told her that "she felt that [Mother] was neglecting the kids." Mother started spending more time with the kids.

Mother sometimes took T. L. with her on her nights out, and they would stay with the man she dated before Ailey. T. L. would sleep on the floor next to the bed that Mother shared with her boyfriend.

Eventually, she and the children moved into a house with Ailey. Sometimes when the children were at Father's on the weekend, she and Ailey would have a party with other people. These parties included alcohol, and sometimes women would flash their breasts.

Officer Mark Amos Taylor of the Knoxville Police Department ("KPD") testified that he was an investigator in the family crimes unit. He spoke with the Defendant at the Defendant's home about T. L.'s allegations. The Defendant denied the allegations but acknowledged that he and T. L. would sit in his recliner together. According to Officer Taylor, the Defendant explained T. L.'s actions that resulted in his hand sometimes touching

---

[2] Mother explained that "Aunt Mo" was Grandmother's sister.

her as follows: "She crawled out of the chair – well, she crawled. She just rolled over face first and would go out. She'd do that all the time, like, and I kept telling her because my hand hit – would end up in the wrong place, and I kept telling her, 'T[], you're breaking my arm. I can't do that.'" Officer Taylor returned to the Defendant's house at a later date and spoke with both the Defendant and Grandmother. Officer Taylor testified that, at that time, the Defendant told him that he was impotent.

Officer Taylor took a more "formal" statement from the Defendant in February 2010 at the KPD. Investigator Lynn Everett also participated in this interview, which was video-recorded. The video-recording was admitted into evidence and played for the jury. During the interview, the Defendant admitted to touching T. L.'s genital area with his hand two or three times, and he also admitted that he did so because it excited him. Toward the end of the interview, the Defendant voiced an apology to the victim which Officer Taylor wrote down. The Defendant reviewed the written apology after it was completed and signed it. The apology was admitted into evidence and provides as follows:

T[],

I did not intend on hurting you when I rubbed you on your privates (vagina). I didn't intend on it to happen; but, it did and I am very sorry! I hope you can forgive me and get along with a "well-prosperous" life. You did nothing wrong – I did and I'm sorry!

On cross-examination, Officer Taylor admitted that there was no physical evidence corroborating T. L.'s allegations.

The Defendant testified that he was seventy-one years old. He had been married to Grandmother for thirty-five or thirty-six years, and they had two sons. One of his sons, Father, had five children, one of whom is T. L. Mother was the mother of T. L. and Nicholas, and Father's other three children were by Mother's sister, Ashley. He stated that he was close to his grandchildren and loved them "to death." Ashley's children continued to visit him.

According to the Defendant, Father and Mother dated in high school and eventually married. Father and Mother lived with the Defendant and Grandmother for a time. Later, they moved out and started their family. When Father and Mother divorced, Mother and the children returned to the Defendant's house to live. The Defendant testified that he had no ill feelings toward Mother about the divorce, and he told her that she was the daughter he never had. Over time, however, he and Grandmother became concerned about Mother's dating behavior, particularly when Mother would take T. L. with her on overnight dates.

Eventually, Mother moved out, taking T. L. and Nicholas with her. At that time, she was dating a man named Michael. The Defendant continued to see T. L. and Nicholas frequently at the Defendant's house.

The Defendant stated that "all kids" were welcome at his house and that he frequently had children other than his grandchildren visiting. Grandmother's sister's children visited, and his own sister's children visited. Lots of children visited during holiday celebrations.

The Defendant stated that he played checkers and put together puzzles with T. L. and that they also baked brownies and funnel cakes together. He never had a problem with T. L. When he sat in his favorite chair, she would climb up into his lap. Sometimes she would take a nap in his lap. He testified that nothing improper ever took place in his chair, on the couch in the living room, or on his bed.

The Defendant testified about T. L.'s movements when getting out of his chair:

> Normally, she would just get out, but there was one particular time that she was sitting on my left leg, and I had my arm on the chair, the recliner, and she rolled over the back of my hand and rolled off, and I felt her pelvis bone on the back of my hand as she rolled off. When that first happened, you know, I didn't think much about it. But kids climb all over you, get on your back and everything. I didn't think a whole lot about it the first time. The second time that it happened I said, "T[], don't do that. You're hurting my hand." So she didn't say anything. She went on. A little while later she come [sic] back, she got back in my lap again, and she sat there a few minutes, and she rolled off again. I said, "T[], don't do that. You're breaking my hand." She wasn't hurting me, but I just wanted her to stop, because I was real uncomfortable with her doing that to me.

> And I had – I had cut myself with a grinder that had a cut off blade in it on my finger, which I still got a scar from it, and it was in the bend of my finger which it healed kind of like a callous, a real – just not – didn't have a scab on it, more of a callous over it, and it was real rough. That third time she got off, she went to the bathroom where my wife was at, and my wife come [sic] in and jumped all over me, because she had a scratch.

When asked where T. L. had been scratched, the Defendant testified, "I didn't know where at. It was in her private area, leg or thigh – inner thigh. I don't know where it was at." He also speculated that his watch or one of his fingernails caused the scratch.

6

The Defendant recalled Officer Taylor coming to his house and speaking with him. He told Officer Taylor "seven, eight, nine times" about T. L. sliding off of the chair. He told Officer Taylor that Grandmother could verify what had happened, and he asked Officer Taylor to return to the house to speak with her. When Officer Taylor returned, they both spoke with him together.

After these interviews, Nicholas and T. L. visited only once or twice more, and he did not speak with T. L. on either occasion. The Defendant was very unhappy and upset about the separation from his grandchildren. He determined "to find out what it was that was affecting [his] granddaughter that she would make these allegations against [him]." Accordingly, he set up the meeting with Officer Taylor in February.

About a year previously, the Defendant testified, he had been to visit his doctor and had been prescribed Xanax. Occasionally, he would take one-half of a tablet at night to help him sleep. On the morning of his meeting with Officer Taylor at the police station, he was very nervous. He took a whole Xanax and, when he remained nervous, took two of his wife's. He stated that he had never taken Xanax during the day before and "had no idea how they would affect [him] during the day." He took them because he thought they would "just . . . relax [him] to where [he] wouldn't be nervous."

He arrived at the police station on time. He first spoke with Officer Everett. By the time Officer Taylor joined them, the Defendant was feeling "[p]retty much out of it." When asked what he remembered about his conversation with Officer Taylor, the Defendant testified,

> I remember him coming in. I remember the statement coming up about her sliding off my hand, and I remember Taylor telling me that I was lying about that, and that upset me real bad, and I told him that I'm not no child molester, and that's pretty much all I remember about the whole thing.

Asked how he felt when he left the police department that day, the Defendant testified,

> I – I don't remember. I know I was in a room, and I don't remember leaving that room, but I remember walking through a door to the lobby. When I seen [sic] my wife, my wife and I walked outside. I remember I felt like a – I guess if you was [sic] a zombie, that's what I felt like. I was just – my whole body was just numb.

He realized later that his statement had not "gone well" for him.

7

On cross-examination, the Defendant testified that his relationship with T. L. had been special, that she was his first granddaughter. He remembered when T. L. complained that he had hurt her and put a mark on her skin near her "privates" because his wife spoke to him about it, and she was upset. He heard his wife tell T. L. to never let anyone touch her private area. The Defendant showed the jury the scar on his hand where the callous had been. He reiterated that T. L. had rolled off the recliner arm over his hand three times on that day. He did not hear T. L. say anything to indicate that she was in pain. When his wife confronted him, he told her what happened. T. L. was standing there, and when Grandmother asked her, "Is that what happened?", T. L. said, "yes."

The Defendant stated that he did not remember telling Officer Taylor that he had touched T. L.'s vagina several times. He also did not remember telling Officer Taylor that T. L. liked to be rubbed down there. He did not remember Officer Everett asking him about any medications he had taken that morning. He did not remember telling Officer Everett that he had not taken any medications other than his insulin and blood pressure medication. He did not remember telling Officer Taylor that T. L. had grabbed his hand one time and put it on her breast, but he did recall T. L. grabbing his hand one time and putting it on her chest with both of her hands.

Dr. David T. Stafford testified that he is a toxicologist. Asked about the effects of Xanax, Dr. Stafford explained that it can cause a drop in blood pressure, an increase in heart rate, and "a degree of confusion and some short-term memory loss." He emphasized that it does not affect everyone in the same way. He reviewed the Defendant's videotaped statement and opined that there were "some slight indications" that he was under the influence of Xanax. Dr. Stafford explained: "At some times he was hesitant about answering questions and – as if he maybe didn't quite understand, but he eventually answered every question, I think, that was asked him, and he was, at times, a little – perhaps a little confused. He was hesitant." He agreed that the Defendant's failure to remember the interview could be an effect of Xanax. He also testified that, if a person was accustomed to taking one-half milligram of Xanax and then took three milligrams, the possibility of greater confusion would be increased.

Kenneth Wayne Maples testified that he had known the Defendant all his life. He worked with one of the Defendant's sons and knew Mother. He attended parties at Mother's house. The children, T. L. and Nicholas, were present at these parties. He described the parties as involving alcohol and "flashing." He stated that the parties "got wild a lot" and were "free-spirited." He added that he had seen "a lot of touching between people, kissing, crotch grabbing, stuff like that." According to Maples, T. L. saw some of these activities.

Maples testified that Ailey disciplined the children by speaking "very, very loud" to them and that he was very stern, frequently sending them to their bedrooms, where he would lock them in. T. L. and Nicholas "really didn't care for it." He also testified that, when T. L. would greet him, she would "run and jump and hug [him] . . . with her arms, and then wrap her legs around [him] at the same time." This made him uncomfortable so he would pull her away and put her on the floor. He also saw T. L. run and jump on the Defendant while he was sitting on the couch, straddling him. He described the Defendant's response to T. L.'s conduct as "uncomfortable," and he heard the Defendant telling her to quit "multiple times."

Doug Lyle, Jr., testified that he is the Defendant's son. He and his son, who was fifteen, lived with the Defendant. Many children continued to visit frequently, and the Defendant behaved "like any grandfather should." He described the Defendant as "the most honest man I know."

Whitney Hardy testified that the Defendant is her uncle. She is the daughter of Grandmother's sister. She had known the Defendant her whole life and described the Defendant as "like a dad to me." As she was growing up, she spent the night at the Defendant's house "[a] lot." He never gave her a reason to be afraid. She has three children, two girls and a boy, and they continue to spend time with the Defendant. She had seen T. L. with the Defendant, and T. L. never showed any fear or concern about being with the Defendant.

Hardy knew Mother and Ailey, and she lived next door to them for about a year. She did not like Ailey and stated that he "wasn't very nice" to T. L. and Nicholas. She added, "He didn't really ever talk to them except for to tell them to go away." He also yelled at them "a lot."

On cross-examination, Hardy stated that she had watched the video-recording of the Defendant's interview with Officer Taylor. She also stated that she continued to visit the Defendant with her children.

Jody Monroe testified that the Defendant was her uncle. She grew up around the Defendant and spent "97 percent" of her time at his house. She described the Defendant as "[m]ore like a father for me." She was "[v]ery comfortable" spending time alone with him, and he never touched her improperly.

Monroe has three children, and she was very comfortable with them all spending time with the Defendant. She preferred that her eldest daughter did not spend time alone with T. L., however, because T. L. "was just a little faster than [her] daughter." She explained that

9

T. L. was "[m]ore advanced" with respect to "[s]exual stuff." She also stated that she had seen interactions between T. L. and Ailey and saw Ailey yell at the children "[m]any times."

On cross-examination, Monroe acknowledged that she had watched the videotaped interview of the Defendant and stated that some of the things he said surprised her. She also stated that, during the interview, the Defendant was "not the Doug that I'm around all the time." She explained that her perceived discrepancy was based on "[t]he things that he was saying, and the way they were coming out, I guess. He's usually more straightforward, is the only way I know how to say it."

Nicole Bajoie testified that she was employed at ChildHelp and, on October 13, 2009, interviewed T. L. The interview was video-recorded, and a portion of the recording was played for the jury. The trial court instructed the jury that it was to consider the recording only for the issue of the witnesses' credibility. After the tape was played, Bajoie testified that she recalled T. L. telling her that the touching did not happen anywhere other than the Defendant's chair.

On cross-examination, Bajoie confirmed that T. L. had told her that the Defendant had touched her on the inside of her "private" with his finger. T. L. did not say that anyone else had touched her and denied that anyone else had touched her.

Father testified that he is the Defendant's son and T. L.'s father. He continued to have a good relationship with T. L. after her accusations against the Defendant arose. He had been told not to speak with her about the allegations, and he respected that instruction. Mother spoke to him about her dream and told him that, in her dream, the person of concern was Ailey.

Father testified that the Defendant had a reputation for truthfulness and stated that "[h]e's a very honest person." He testified that the Defendant's testimony should be believed. He also testified that, although he loved T. L. "very much," he also believed that her reputation for truthfulness was "[b]ad."

Ashley Yoder testified that she is Mother's sister. She eventually began dating Father, which caused a year-long rift in her relationship with Mother, but they had since reconciled and had a "good" relationship. Yoder and Father had three children together, and their children spent time with T. L. and Nicholas. She stated that her relationship with T. L. was "really good" and that T. L.'s accusations had not affected it.

At one point after the accusations arose, T. L. asked to go with Yoder to the Defendant's house. Yoder took her and told her that she could wait in the car while Yoder picked up her children, but T. L. wanted to go inside. They stayed about thirty minutes.

10

Nicholas continued to visit at the Defendant's house, and Mother would take him there to spend the night.

Yoder described her relationship with Ailey as "neutral" and added that the children "don't seem to like him too much."

Yoder stated that the Defendant had a reputation for truthfulness and that his testimony should be believed. She also stated that T. L.'s reputation for truthfulness was "bad."

The State called Officer Lynn Everett of the KPD in rebuttal. He assisted Officer Taylor in interviewing the Defendant at the police station. At the beginning, he asked the Defendant if he had taken any medications. The Defendant told him that he had taken insulin and his blood pressure medication, but nothing else. Officer Everett also testified that, due to his experience as a patrol officer, he was familiar with the characteristics of persons under the influence of intoxicants and controlled substances. He stated that he did not observe such characteristics in the Defendant that morning.

On cross-examination, Officer Everett stated that he met the Defendant at 9:00 a.m. that morning and stayed with him until 11:30 a.m., when Officer Taylor joined them. During the two and one-half hours before Officer Taylor arrived, the Defendant denied having any improper contact with T. L.

The jury retired for deliberations and returned a verdict of aggravated sexual battery on Count 1; aggravated sexual battery on Count 2; and not guilty on Count 3. After a sentencing hearing, the trial court sentenced the Defendant to the maximum term of twelve years on each count and ordered that the terms be served concurrently, for an effective sentence of twelve years in the Tennessee Department of Correction. The defense filed a motion for new trial, which the trial court denied. This appeal followed, and the Defendant raises the following issues: (1) the State's election of offenses did not assure jury unanimity; (2) the trial court erred in failing to merge the two convictions; (3) the trial court erred in its ruling on a Tennessee Rule of Evidence 412 motion; (4) the trial court erred in instructing the jury that the offense of aggravated sexual battery could be committed recklessly; and (5) his sentences are excessive.

## Analysis

### Election of Offenses

Because the State elicited testimony from T. L. that the Defendant had touched her inappropriately on multiple occasions, the State was required to elect the distinct offense

about which the jury was to deliberate in returning its verdict as to each specific count. See State v. Shelton, 851 S.W.2d 134, 136-37 (Tenn. 1993); Burlison v. State, 501 S.W.2d 801, 803-04 (Tenn. 1973). In accordance with the State's election, the trial court instructed the jury as follows:

> In this case the state has elected to submit for your consideration on the alleged acts of rape of a child and aggravated sexual battery as follows:
>
> Count 1: Refers to the time when T[] L[] was asked about a specific time near the end of the abuse between the fourth and fifth grade, and she stated that she and the defendant were watching TV and that the defendant inserted his finger in her vagina while sitting in the recliner in the defendant's home.
>
> Count 2: Refers to the time when T[] L[] stated that the defendant just rubbed the outside of her vagina with his hand under her clothing, but did not insert her (sic) finger in her vagina on that occasion while sitting in the recliner in the defendant's home.
>
> Count 3: Refers to the time when T[] L[] stated that the defendant touched her breasts over her clothing while on the defendant's couch in his home.
>
> You are to consider only the alleged act in each count in deciding whether or not the defendant has been proven guilty beyond a reasonable doubt of the offenses charged and included in that count.

The Defendant contends that the victim did not testify with sufficient particularity about any particular instances of criminal conduct and that the State's election as to both Counts 1 and 2 was inadequate because the conduct described was not sufficiently distinct, particularly in light of the jury's rejection of digital penetration in Count 1. The State disagrees.

The primary purpose for the election requirement is to ensure that the jury is deliberating about a single instance of alleged criminal conduct so that the jury may reach a unanimous verdict. See Shelton, 851 S.W.2d at 137. In this case, we hold that the election of offenses as to Count 1 was adequate. At trial, the prosecutor engaged in the following colloquy with T. L.:

> Q  All right. Now, let's talk about, just for a minute, you said he touched you in wrong places. Tell me, where did he touch you?

12

A  My chest, my private, and my butt.

Q  And was this something that happened just one time?

A  No.

Q  How often do you think that would happen?

A  When I go over there sometimes.

Q  Did it happen every time you went over there?

A  No.

Q  Can you – I want you to think, about how old – remembering back, about how old were you when this started?

A  I can't remember.

Q  Do you remember what grade you were in at school – had you already started in school?  Like, had you begun going to Belle Morris at that point?

A  Yes.

Q  Okay.  Do you remember what grade you were in when it started?

A  Kindergarten.

Q  How old were you when it ended?

A  Ten.

Q  Let me ask you this.  Do you remember what grade you were in *the last time it happened?*

A  Fourth.

Q  Fourth.  Okay.  And did it happen in the – in the summer between fourth and fifth grade, or did it end at the school year, or when – do you know about *when the last time was that it happened?*

13

A Between the fifth and fourth grade.

Q Okay. *And that was the last time?*

A Yes.

Q As far as you remember, did it ever happen when you were in the fifth grade?

A No.

Q And did you ever miss – have to repeat any classes?

A No.

Q Like did you like have to do first grade, second – first grade twice or anything like that? You went –

A No.

Q – straight through? Do you know how old you were when you started kindergarten?

A Five.

Q And when he would touch you, where were – where did these occur, these touches?

A In the living room.

Q In what house?

A His house.

. . . .

Q What locations, or was it more than one place that it happened in or just one place?

A More than one.

14

Q  Tell me where you remember these things happening.

A  In his chair.  In the couch.

Q  Okay.  And describe his chair for me.

A  It's brown and leather.

Q  And do you remember what room in the house it was in?

A  Living room.

Q  And was this the kind of chair that just sort of sits here like this, or does it kind of lean back or anything like that?  Do you remember?

A  It's a recliner.

Q  Recliner.  And you sat on the couch too?

A  Yes.

Q  What couch?  Where was the couch?

A  In the living room.

Q  The same room that the recliner was in?

A  Yes.

. . . .

Q  Now, I want you to think back to *one of the last times that that happened*.  Let's just start there, you know, near the end, maybe *that summer between the fourth and fifth grade* or in the fourth grade there.  I want you to think about *a time* that he touched you on a private part, okay, and you mentioned the chair.  Did he ever touch you on your private part *while you were in that chair in the fourth grade or in the summer between fourth and fifth*?

A  Yes.

Q  Tell me what happened – that you remember happening.

15

A   When we would watch TV and I would sit beside him.

Q   Would anybody else be in the room with you?

A   No.

Q   What would happen?

A   He would touch my private.

Q   What would he touch your private with?

A   His hand.

Q   And would that be over your clothes or under your clothes?

A   Under.

Q   Did you have on underwear?

A   Yes.

Q   Okay.  Would it be over top of the underwear or under the underwear?

A   Both.

Q   Both.  Now, *this time* when you're on the couch [sic] and his hands – I want to ask you about *one of the times that he put his hand under your underwear*.  Okay?  What did he do when his hand was under your underwear?

A   He would rub.

Q   And how long would that last?

A   I don't remember.

Q   How did it feel?

A   Bad.

Q   Did he ever put anything inside of you?

16

A  Yes.

Q  What?

A  His finger.

Q  What did that feel like?

A  Scratchy.

. . . .

Q  And did that ever happen anywhere besides *there on the chair*?  The finger going inside your private's what I mean.

A  No.

Q  And how many times do you think he put his finger inside your private part?

A  More than once.

Q  You don't remember an exact number?

A  I don't remember the exact number.

(Emphases added).

On the basis of this proof, the State selected a single instance of conduct for the jury's consideration on Count 1:  the time near the end of the alleged course of conduct when T. L. and the Defendant were seated in his recliner watching television and the Defendant put his hand beneath her underwear and placed his finger in T. L.'s vagina.  Although the jury rejected T. L.'s claim that the Defendant actually penetrated her, the jury accredited her testimony that the Defendant touched her genital area on this particular occasion.  We hold that the State's election of offenses was adequate as to Count 1 and that the Defendant is entitled to no relief on this basis.

T. L. also testified as follows:

Q  Were there ever any times that he would touch you on your private part that he didn't put his finger inside of you?

17

A  Yes.

Q  And where did – where would that take place?

A  In his chair.

Q  In the chair too?

A  Yes.

. . . .

Q  Did he ever just rub you on the outside of the clothing without putting his hand inside your clothing, rub your private part on the outside?

A  Yes.

Q  Where would that happen?

A  In his chair.

Q  In the chair?  Did things happen mostly in that chair?

A  Yes.

This testimony failed to distinguish one incident of non-penetration touching from any other incident.  While the State tried to distinguish between over-clothing and under-clothing touching, it is not at all clear that T. L. understood that distinction.  Moreover, she did not testify about any particular time or occasion when either type of touching occurred. Additionally, although the Defendant admitted in his statement to having touched T. L.'s genital area with his hand on two or three occasions, he did not distinguish between them. In short, the State failed to adduce sufficient proof from any source as to any particular incident of the Defendant touching the victim's genital region unaccompanied by penetration. Because it failed to elicit the necessary distinctive proof, we hold that the State's election of offenses as to Count 2 was inadequate.  Accordingly, we must reverse the Defendant's conviction of aggravated sexual battery on Count 2 and remand this matter for further proceedings consistent with this opinion.  See Burlison, 501 S.W.2d at 806-07.

*Merger of Offenses*

The Defendant also contends in his brief that, if this Court determines that the State's election of offenses as to both counts was adequate, then "the convictions for counts one and two should merge because there is not an adequate factual difference between the two definitions [sic] given the fact that the jury rejected proof of vaginal penetration." Because we have concluded that the State's election of offenses was not adequate as to Count 2, we deem this issue moot and decline to address it.

*Exclusion of Proof Under Tennessee Rule of Evidence 412*

On the morning of trial, the defense filed a motion and affidavit pursuant to Tennessee Rule of Evidence 412 in an attempt to obtain a ruling from the trial court that certain evidence about the victim would be admissible at trial. The State objected to the admissibility of the evidence on the grounds that it was not relevant and that the motion had not been filed in compliance within the time period set forth in Rule 412. The trial court denied the Defendant's motion on the ground that it was not timely. When asked to reconsider its ruling later in the trial, the trial court reaffirmed its original ruling. Accordingly, the defense was not permitted to introduce the evidence about the victim at trial. The Defendant contends that the trial court committed reversible error in denying his Rule 412 motion.

Initially, we note that, as the State points out in its brief, neither the Rule 412 motion nor the affidavit in support thereof is in the appellate record. Although defense counsel stated during oral argument that he would supplement the appellate record with these materials after argument, he apparently has not done so. Accordingly, this issue has been waived. See Tenn. R. App. P. 24 (a), (b); State v. Ballard, 855 S.W.2d 557, 560-61 (Tenn. 1993).

Although the appellate record is incomplete as to this issue, the record does contain a transcript of the hearing on the Defendant's motion.[3] The transcript reveals that, on the Friday before trial, defense counsel learned of allegations that the victim had twice been seen engaging in sexual experimentation or play with a male child. The defense wanted to introduce proof about these "specific instances of sexual contact" in order to establish the

---

[3] The hearing consisted solely of argument by counsel for the parties and did not include any sworn testimony.

victim's sexual knowledge. The defense argued that proof of the victim's sexual knowledge was relevant

> to show that [the victim] was . . . placed in a situation where she saw way too much physical contact between male and females around her for a period of years before this allegation arose, and that it had become integral to her understanding of how relationships work with adults, and how people get people to do what they want them to do. It will be our assertion at the end of the trial that that's part of the reason why she might have – have created a fabrication that's resulted in these charges.

Tennessee Rule of Evidence 412, frequently referred to as the "rape shield law," is intended to limit evidence about the sexual past of a sex crime victim. The Rule "strikes a balance between the paramount interests of the accused in a fair trial and the important interests of the sexual assault victim in avoiding an unnecessary, degrading, and embarrassing invasion of sexual privacy." Tenn. R. Evid. 412, Advisory Comm'n Cmts.

Before a defendant may elicit proof about specific instances of a victim's "sexual behavior," the defendant must comply with certain prerequisites. The first of these prerequisites is the filing of a written motion which

> *shall* be filed no later than ten days before the date on which the trial is scheduled to begin, except the court may allow the motion to be made at a later date, including during trial, if the court determines either that the evidence is newly discovered and could not have been obtained earlier through the exercise of due diligence or that the issue to which such evidence relates has newly arisen in the case.

Tenn. R. Evid. 412(d)(1)(i) (emphasis added). This ten day rule "is designed to provide the prosecution and the victim an opportunity to investigate the proposed proof and to contest the issue." Tenn. R. Evid. 412, Advisory Comm'n Cmts.

This Court has observed that "[t]he policies behind the rape shield law require strict compliance with the procedures set forth" in Tennessee Rule of Evidence 412(d). State v. Benjamin F. Dishman, No. 03C01-9610-CR-00361, 1998 WL 191447, at *15 (Tenn. Crim. App. Apr. 23, 1998). Accordingly, "'prior sexual behavior with others by the victim is altogether inadmissible unless there is compliance with Rule 412(d).'" Id. (quoting State v. Stephen Ray Stamps, No. 02-C-01-9301-CC-00002, 1994 WL 59451, at *7 (Tenn. Crim. App. Mar. 2, 1994)). When a trial court is presented with an untimely Rule 412 motion, then, its exercise of discretion in determining whether the evidence is admissible is "limited to determining whether the testimony presented . . . [related to a newly arisen issue or] was

newly discovered evidence or evidence which could not have been discovered beforehand with the exercise of due diligence." Id.

In this case, defense counsel acknowledged that the evidence was not newly discovered but, rather, was deliberately kept from counsel by the Defendant and his family until right before trial. Moreover, the issue to which the evidence related was not newly arisen. Accordingly, we hold that the trial court did not err in denying the Defendant's motion. See State v. Willie Earl Brown, Jr., No. M2009-00505-CCA-R3-CD, 2010 WL 4396490, at *17 (Tenn. Crim. App. Nov. 5, 2010); State v. Gussie Willis Vann, No. 03C01-9408-CR-00279, 1995 WL 548830, at *5 (Tenn. Crim. App. Sept. 18, 1995).

The Defendant argues that, nevertheless, the trial court should have assessed whether preclusion of the evidence on notice grounds compromised his Sixth Amendment rights, citing Michigan v. Lucas, 500 U.S. 145, 151-53 (1991). We decline to address this argument because we agree with the State that, even if the Defendant had timely filed his motion, the evidence was not admissible.

When a defendant meets all of the procedural requirements of Rule 412, "[e]vidence of specific instances of a victim's sexual behavior is inadmissible unless . . . the evidence is . . . [offered] to prove or explain . . . [the victim's] knowledge of sexual matters." Tenn. R. Evid. 412 (c)(4)(ii). This provision

> will most frequently be used in cases where the victim is a young child who testifies in detail about sexual activity. To disprove any suggestion that the child acquired the detailed information about sexual matters from the encounter with the accused, the defense may want to prove that the child learned the terminology as the result of sexual activity with third parties.

Tenn. R. Evid. 412, Advisory Comm'n Cmts.

Even if the proof sought to be introduced by a defendant falls within the parameters of admissibility under Rule 412, however, a victim's knowledge of sexual matters also must be relevant to an issue in the case. See Tenn. R. Evid. 402. See also State v. Brown, 29 S.W.3d 427, 431 (Tenn. 2000) (recognizing that evidence meeting the threshold admissibility requirements of Rule 412 may nevertheless be inadmissible pursuant to other rules of evidence). The issues in this case were (1) whether the Defendant penetrated the victim's vagina with his hand and (2) whether he touched the victim's genital region with his hand for the purpose of sexual pleasure or gratification. The victim testified that the Defendant penetrated her vagina with his hand and touched her genital region with his hand. The defense theory was that the victim had caused the touching herself by repeatedly straddling and sliding over the Defendant's hand. We fail to see how the victim's alleged "sexual

21

knowledge" gained through alleged play or experimentation with another child has any probative value regarding the issues at trial. Any sexual play or experimentation that the victim may have engaged in with another child is in no way relevant to the issue of how the Defendant's hand came into contact with the victim's genital region, unless the play or experimentation mimicked either theory of the touchings. There is no proof in the appellate record that the victim had engaged in such alleged behavior with another person. Moreover, we fail to understand the alleged connection between the victim's alleged conduct and the defense theory that the victim was lying. Accordingly, we hold that the trial court committed no error in excluding the evidence sought to be introduced by the Defendant. The Defendant is entitled to no relief on this basis.

*Jury Instructions*

The Defendant next contends that the trial court committed reversible error in charging the jury on the elements of aggravated sexual battery. The trial court charged the jury as follows:

> Any person who commits the offense of aggravated sexual battery is guilty of a crime.
>
> For you to find the defendant guilty of this offense, the state must have proven beyond a reasonable doubt the existence of the following essential elements:
>
> That defendant had unlawful sexual contact with the alleged victim in which the defendant intentionally touched the alleged victim's intimate parts or the clothing covering the immediate area of the alleged victim's intimate parts; and that the alleged victim was less than 13 years of age; and that the defendant acted either intentionally, knowingly, or recklessly.
>
> . . . .
>
> Sexual contact includes the intentional touching of the alleged victim's or the intentional touching of the clothing covering the immediate area of the alleged victim's parts [sic] if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification.
>
> Intimate parts includes the primary genital area, groin, inner thigh, buttock, or breast of a human being.

22

Additionally, the trial court instructed the jury about the mental states of recklessly and intentionally:[4]

> Recklessly means that a person acts recklessly with respect to the circumstances surrounding the conduct or to a result of the conduct when the person is aware of, but consciously disregards a substantial and unjustifiable risk that the circumstance exists or a result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused's person's standpoint.

> Intentionally means that a person acts intentionally with respect to the nature of the conduct or to a result of the conduct when it's the person's conscious objective or desire to engage in the conduct or cause the result.

The Defendant complains that these instructions permitted the jury to convict him for recklessly touching the victim's intimate parts, while the statute requires that the touching be intentional. The State disagrees.

This Court has recognized that the various elements of aggravated sexual battery involve distinct culpable mental states. See State v. Parker, 887 S.W.2d 825, 827 (Tenn. Crim. App. 1994). The element of "sexual contact" must be committed "intentional[ly]" and for "the purpose of sexual arousal or gratification." Tenn. Code Ann. § 39-13-501(6) (2006). When the victim is less than thirteen years old, the defendant's culpable mental state as to the victim's age may be reckless. See Parker, 887 S.W.2d at 828; State v. Harold Leon Sutton, No. 03C01-9708-CC-00344, 1998 WL 126250, at *2 (Tenn. Crim. App. Mar. 23, 1998), perm. app. denied (Tenn. Nov. 2, 1998).

While criminal defendants have "a constitutional right to a correct and complete charge of the law," State v. Teel, 793 S.W.2d 236, 249 (Tenn. 1990), we review a trial court's jury instructions in context of the overall charge and not in isolation. See State v. Phipps, 883 S.W.2d 138, 142 (Tenn. Crim. App. 1994). A trial court commits reversible error if its charge "fails to fairly submit the legal issues or if it misleads the jury as to the applicable law." State v. Hodges, 944 S.W.2d 346, 352 (Tenn. 1997).

We hold that the trial court's jury charge in this case fairly submitted the appropriate legal issues to the jury and did not mislead the jury as to the applicable law. The jury was

---

[4] The trial court also instructed the jury on the mental state of "knowingly," but that instruction is not at issue in this appeal.

instructed that it could find the Defendant guilty of aggravated sexual battery only upon its determination that the Defendant had intentionally touched the victim's intimate areas for the purpose of sexual arousal or gratification. This Court previously has upheld nearly identical jury instructions. See, e.g., State v. Julio Ramirez, No. M2009-01617-CCA-R3-CD, 2011 WL 2348464, at *20 (Tenn. Crim. App. June 8, 2011), perm. app. denied (Tenn. Sept. 21, 2011); State v. Chester Wayne Walters, No. M2003-03019-CCA-R3CD, 2004 WL 2726034, at *14 (Tenn. Crim. App. Nov. 30, 2004), perm. app. denied (Tenn. Mar. 21, 2005). Accordingly, the Defendant is entitled to no relief on this basis.

*Sentencing*

In his final issue, the Defendant complains that his sentence is excessive. The State disagrees.

Prior to imposing sentence, a trial court is required to consider the following:

(1) The evidence, if any, received at the trial and the sentencing hearing;

(2) The presentence report;

(3) The principles of sentencing and arguments as to sentencing alternatives;

(4) The nature and characteristics of the criminal conduct involved;

(5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in [Tennessee Code Annotated sections ] 40-35-113 and 40-35-114;

(6) Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and

(7) Any statement the defendant wishes to make in the defendant's own behalf about sentencing.

Tenn. Code Ann. § 40-35-210(b) (2010).

The referenced "principles of sentencing" include the following: "the imposition of a sentence justly deserved in relation to the seriousness of the offense" and "[e]ncouraging effective rehabilitation of those defendants, where reasonably feasible, by promoting the use of alternative sentencing and correctional programs." Id. § 40-35-102(1), (3)(C) (2010).

24

"The sentence imposed should be the least severe measure necessary to achieve the purposes for which the sentence is imposed," and "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant should be considered in determining the sentence alternative or length of a term to be imposed." Id. § 40-35-103(4), (5) (2010).

Our Sentencing Act also mandates as follows:

In imposing a specific sentence within the range of punishment, the court shall consider, but is not bound by, the following advisory sentencing guidelines:

(1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and

(2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in [Tennessee Code Annotated sections] 40-35-113 and 40-35-114.

Tenn. Code Ann. § 40-35-210(c) (2010).

Additionally, a sentence including confinement should be based on the following considerations:

(A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;

(B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or

(C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant.

Id. § 40-35-103(1).

When the record establishes that the trial court imposed a sentence within the appropriate range that reflects a "proper application of the purposes and principles of our Sentencing Act," this Court reviews the trial court's sentencing decision under an abuse of discretion standard with a presumption of reasonableness. State v. Bise, 380 S.W.3d 682,

25

707 (Tenn. 2012). "[A] trial court's misapplication of an enhancement or mitigating factor does not remove the presumption of reasonableness from its sentencing decision." Id. at 709. This Court will uphold the trial court's sentencing decision "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." Id. at 709-10. Moreover, under those circumstances, we may not disturb the sentence even if we had preferred a different result. See State v. Carter, 254 S.W.3d 335, 346 (Tenn. 2008). The party appealing the sentence has the burden of demonstrating its impropriety. Tenn. Code Ann. § 40-35-401, Sent'g Comm'n Cmts. See also State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991).

The trial court sentenced the Defendant as a Range I offender. Aggravated sexual battery is a Class B felony. Tenn. Code Ann. § 39-13-504(b) (2006). Therefore, the Defendant's sentencing range was eight to twelve years. Id. § 40-35-112(a)(2) (2006). The trial court sentenced the Defendant to the maximum term of twelve years for each offense after finding no mitigating factors and a single enhancement factor. The trial court found that the Defendant had abused a position of private trust. See id. § 40-35-114(14) (2006, Supp. 2009). The trial court ordered the two sentences to run concurrently, for an effective sentence of twelve years.

The Defendant contends that the trial court erred in failing to mitigate his sentences on the basis of his "otherwise exemplary life," including his lack of a prior criminal record, his military history, his work history, and the fact that he has "never failed to support his family and extended family." He also contends that his sentences do not take into proper consideration the purposes and principles of sentencing set out in Tennessee Code Annotated section 40-35-102. He argues that, had the trial court properly taken into account the mitigating factors and purposes and principles of sentencing, the trial court would have sentenced him to the minimum term of eight years.

Our legislature has declared that sentences for aggravated sexual battery must be served in confinement at 100%. See id. § 40-35-501(i)(1), (2)(H) (2006, Supp. 2009). Accordingly, the only aspect of the Defendant's sentence over which the trial court had discretion was its length. In determining the length of the Defendant's sentence, the trial court found that the Defendant had abused a position of private trust because the victim was the Defendant's granddaughter. See id. § 40-35-114(14). The trial court accorded this enhancement factor "great significance." The trial court also declined to find any mitigating factors. On this basis, the trial court imposed the maximum sentence available.

In this case, the record supports the trial court's application of this enhancement factor. Accordingly, we hold that the trial court did not err in sentencing the Defendant. The Defendant is entitled to no relief on this basis.

26

## Conclusion

For the reasons set forth above, we affirm the trial court's judgment of conviction of aggravated sexual battery as to Count 1 of the presentment. We also affirm the Defendant's sentence as to that conviction. We reverse the Defendant's conviction of aggravated sexual battery as to Count 2 of the presentment and remand this matter for further proceedings consistent with this opinion.

_____

JEFFREY S. BIVINS, JUDGE